UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 08-159-GWU

KANDIACE SINGLETON, PLAINTIFF,

VS. **MEMORANDUM OPINION**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY, DEFENDANT.

### INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative denial of her application for Supplemental Security Income (SSI).  The appeal is currently before the court on cross-motions for summary judgment.

### APPLICABLE LAW

The Sixth Circuit Court of Appeals has set out the steps applicable to judicial review of Social Security disability benefit cases:

1. Is the claimant currently engaged in substantial gainful activity?  If yes, the claimant is not disabled.  If no, proceed to Step 2.  See 20 C.F.R. 404.1520(b), 416.920(b).

2. Does the claimant have any medically determinable physical or mental impairment(s)?  If yes, proceed to Step 3.  If no, the claimant is not disabled.  See 20 C.F.R. 404.1508, 416.908.

3. Does the claimant have any severe impairment(s)--i.e., any impairment(s) significantly limiting the claimant's physical or mental ability to do basic work activities?  If yes, proceed to Step 4.  If no, the claimant is not disabled.  See 20 C.F.R. 404.1520(c), 404.1521, 416.920(c), 461.921.

1

    4.      Can the claimant's severe impairment(s) be expected to result in death or last for a continuous period of at least 12 months? If yes, proceed to Step 5. If no, the claimant is not disabled. See 20 C.F.R. 404.920(d), 416.920(d).

    5.      Does the claimant have any impairment or combination of impairments meeting or equaling in severity an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing of Impairments)? If yes, the claimant is disabled. If no, proceed to Step 6. See 20 C.F.R. 404.1520(d), 404.1526(a), 416.920(d), 416.926(a).

    6.      Can the claimant, despite his impairment(s), considering his residual functional capacity and the physical and mental demands of the work he has done in the past, still perform this kind of past relevant work? If yes, the claimant was not disabled. If no, proceed to Step 7. See 20 C.F.R. 404.1520(e), 416.920(e).

    7.      Can the claimant, despite his impairment(s), considering his residual functional capacity, age, education, and past work experience, do other work--i.e., any other substantial gainful activity which exists in the national economy? If yes, the claimant is not disabled. See 20 C.F.R. 404.1505(a), 404.1520(f)(1), 416.905(a), 416.920(f)(1).

Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

Applying this analysis, it must be remembered that the principles pertinent to the judicial review of administrative agency action apply. Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence. Jones v. Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir. 1991). This "substantial evidence" is "such evidence as a reasonable mind shall accept as adequate to

support a conclusion;" it is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight. Garner, 745 F.2d at 387.

One of the detracting factors in the administrative decision may be the fact that the Commissioner has improperly failed to accord greater weight to a treating physician than to a doctor to whom the plaintiff was sent for the purpose of gathering information against his disability claim. Bowie v. Secretary, 679 F.2d 654, 656 (6th Cir. 1982). This presumes, of course, that the treating physician's opinion is based on objective medical findings. Cf. Houston v. Secretary of Health and Human Services, 736 F.2d 365, 367 (6th Cir. 1984); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984). Opinions of disability from a treating physician are binding on the trier of fact only if they are not contradicted by substantial evidence to the contrary. Hardaway v. Secretary, 823 F.2d 922 (6th Cir. 1987). These have long been well-settled principles within the Circuit. Jones, 945 F.2d at 1370.

Another point to keep in mind is the standard by which the Commissioner may assess allegations of pain. Consideration should be given to all the plaintiff's symptoms including pain, and the extent to which signs and findings confirm these symptoms. 20 C.F.R. § 404.1529 (1991). However, in evaluating a claimant's allegations of disabling pain:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1)

> whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

Duncan v. Secretary of Health and Human Services, 801 F.2d 847, 853 (6th Cir. 1986).

Another issue concerns the effect of proof that an impairment may be remedied by treatment. The Sixth Circuit has held that such an impairment will not serve as a basis for the ultimate finding of disability. Harris v. Secretary of Health and Human Services, 756 F.2d 431, 436 n.2 (6th Cir. 1984). However, the same result does not follow if the record is devoid of any evidence that the plaintiff would have regained his residual capacity for work if he had followed his doctor's instructions to do something or if the instructions were merely recommendations. Id. Accord, Johnson v. Secretary of Health and Human Services, 794 F.2d 1106, 1113 (6th Cir. 1986).

In reviewing the record, the Court must work with the medical evidence before it, despite the plaintiff's claims that he was unable to afford extensive medical work-ups. Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir. 1987). Further, a failure to seek treatment for a period of time may be a factor to be considered against the plaintiff, Hale v. Secretary of Health and Human Services, 816 F.2d 1078, 1082 (6th Cir. 1987), unless a claimant simply has no way

4

to afford or obtain treatment to remedy his condition, <u>McKnight v. Sullivan</u>, 927 F.2d 241, 242 (6th Cir. 1990).

Additional information concerning the specific steps in the test is in order.

Step six refers to the ability to return to one's past relevant category of work. <u>Studaway v. Secretary</u>, 815 F.2d 1074, 1076 (6th Cir. 1987). The plaintiff is said to make out a <u>prima facie</u> case by proving that he or she is unable to return to work. <u>Cf. Lashley v. Secretary of Health and Human Services</u>, 708 F.2d 1048, 1053 (6th Cir. 1983). However, both 20 C.F.R. § 416.965(a) and 20 C.F.R. § 404.1563 provide that an individual with only off-and-on work experience is considered to have had no work experience at all. Thus, jobs held for only a brief tenure may not form the basis of the Commissioner's decision that the plaintiff has not made out its case. <u>Id.</u> at 1053.

Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had. <u>E.g.</u>, <u>Faucher v. Secretary of Health and Human Services</u>, 17 F.3d 171 (6th Cir. 1994). One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities. 20 C.F.R. § 404.1567(b). "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing. 20 C.F.R. § 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990). If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid. Ibid.

In such cases, the agency may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d 279, 282 (6th Cir. 1985). Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's physical and mental impairments. Varley v. Secretary of Health and Human Services, 820 F.2d 777 (6th Cir. 1987).

## DISCUSSION

The plaintiff, Kandiace Singleton, an 18-year-old woman with a high school diploma received after Special Education and no past relevant work experience, filed her current application for SSI on October 10, 2001 alleging disability due to a learning disability and poor eyesight. (Tr. 66-7, 181, 391). The application was denied by Administrative Law Judge (ALJ) Arthur J. Schultz in a February 28, 2003 decision. (Tr. 19-25). After the Appeals Council declined to review, the plaintiff brought an action in this court, which remanded the case at the request of the Commissioner. Singleton v. Barnhart, Lexington Civil Action No. 05-57-JBC (August 16, 2005). In compliance with the Commissioner's request, the Appeals Council's order remanding the case to an Administrative Law Judge noted that the claimant's sole impairment was borderline intellectual functioning, based on a report from a consultative psychological examiner, but the full scale IQ test score of 67 was more consistent with mild mental retardation. (Tr. 469). The Appeals Council noted that

7

other medical evidence included test scores and mental status evaluations beginning at the age of nine which were not consistent with a finding of borderline intellectual functioning (BIF). The Council added that there was evidence that the claimant had difficulty with memory and attention to the extent that she needed to be retrained each week to perform the requirements of a very simple job, could not work unassisted, and had been unsuccessful at several job placements. (Id.).

Following the remand, the case was assigned to ALJ John Lawrence (Tr. 501), who conducted another administrative hearing on June 22, 2006 but passed away before issuing a ruling (Tr. 539). A third ALJ, Don Paris, conducted two additional hearings in 2007 and obtained a new consultative psychological evaluation.

ALJ Paris issued a final decision on September 28, 2007 finding that the plaintiff had severe impairments consisting of a learning disability and borderline intellectual functioning, but did not have an impairment or combination of impairments that met or medically equaled one of the Commissioner's Listing of Impairments. (Tr. 435-6). He concluded that the plaintiff had no exertional restrictions and had the following functional restrictions. She: (1) had a "slight" impairment in her ability to understand, remember, and carry out short, simple work instructions and make judgments on simple, work-related decisions; (2) had a slightly to moderately impaired ability to interact appropriately with the public,

coworkers, and supervisors; and (3) had a "moderate" impairment in her ability to understand, remember, and carry out detailed work instructions and respond appropriately to changes and work pressures in a routine work setting. (Tr. 437-8). When these restrictions were presented to a Vocational Expert (VE), the VE testified that there were jobs that such a person could perform. (Tr. 587-8).

On appeal, this court must determine whether the administrative decision is supported by substantial evidence.

The plaintiff argues in detail that neither of the ALJ decisions adequately considered her school records and testing. As noted by the Appeals Council, a large amount of evidence was submitted showing that the plaintiff was in Special Education throughout school, and underwent IQ testing on at least three occasions. In January, 1993, at the age of 9, the plaintiff obtained a verbal IQ of 69, a performance IQ of 71, and a full scale IQ of 69 on the Wechsler Intelligence Scale for Children--Third Edition (WISC-III). In February, 1996, at the age of almost 13, she obtained a verbal IQ score of 59, a performance IQ of 70, and a full scale IQ of 62 on the WISC-III; additionally, there were low scores in several categories of the Vineland Adaptive Behavior Scale. (Tr. 162). In February, 1999, at the age of 16, the plaintiff's scores on the same test were a verbal IQ of 54, a performance IQ of 57, and a full scale IQ of 51. All of these tests were administered by a certified

school psychologist, who would be considered an acceptable medical source under the Commissioner's regulations. 20 C.F.R. § 416.913.[1]

The plaintiff was scheduled to graduate in the spring of 2002, after making her application for benefits, and it was noted by the school psychologist that, while the plaintiff was passing, she had been placed in classes where additional support was available, and her resource teacher reported that she had not been successful in many of her trial job placements. (Tr. 244). A vocational evaluation report completed by a vocational trainer, Filicia Day, on referral from a vocational counselor at Danville High School, is dated May 1, 2002 and describes the plaintiff's activities and attempted job placements. She was capable of performing some household chores, but the counselor felt that she would need an environment with guidance and supervision. (Tr. 277-8). Her reading skills were good enough to read three-syllable and some four-syllable words, and her writing skills fell within the low average range for a student her age, but she was unable to do math problems without a calculator. (Tr. 278). She had attempted a job as a clerical assistant, doing filing at a doctor's office, but experienced trouble finding slots for all the files, and "the job trainer would always have to catch her up in order to get the job done before it was time to go." (Tr. 279). She attempted another job at a church day

---

[1]IQ test results obtained between the ages of seven and sixteen are considered valid for up to two years if the score is above 40. <u>Elam ex rel Golay v. Commissioner of Social Security</u>, 348 F.3d 124, 125 (6th Cir. 2003).

08-159 Kandiace Singleton

care center but had to be told "over and over" what to do with the babies. (Id.). She could not maintain attention for more than one hour and lacked persistence, although the counselor felt that it was possible that this was because they had not found the right job location for her. (Tr. 279-80). She was unable to read all written directions, and could follow verbal directions well if they were broken down into steps. (Tr. 280). In conclusion, Day believed that the plaintiff would need to work in a place with coworkers who were encouraging her and building her self-esteem, and needed to be in a "small environment so as not to distract her." (Tr. 282).

Other evidence from this period includes notes from teachers and advisers at Danville High School, indicating that the plaintiff had been in Special Education since elementary school, and that all of her academic classes in high school had been taught in a "Special Education resource room." (Tr. 194). Christel Belcher, a Special Education teacher, stated that she had taught the plaintiff for the previous four years and she had had difficulty throughout school understanding concepts beyond the concrete level. She reported that the plaintiff got along well with her peers, but had a slow work rate and frequently became frustrated with hard tasks. (Tr. 200). She felt that the plaintiff "may be employable but it may take time to find her suitable work for her abilities." (Tr. 195). The school's career adviser, Robert Trumbo, stated that she had accomplished the goals that had been set for her in the special needs department at the school, but in the "real world" she would "probably

08-159 Kandiace Singleton

never be able to live by herself but she will be able to take care of her needs with assistance . . . ." (Tr. 196). The plaintiff's math teacher reported that she followed directions well but was unsure on a regular basis of how to solve a problem even after it was explained to her numerous times. (Tr. 197).

In the same time frame, a Social Security employee observed the plaintiff when she was making her application in October, 2001, and noted that she was accompanied by her job coach, who reported that the plaintiff could not do her job of filing folders unassisted and they had to go over the same things each week. (Tr. 192-3). It was also observed that the plaintiff took "a while" to write her signature and was very slow and deliberate with each letter. (Tr. 192).

Additional information from this period includes a driver evaluation from November, 2001, when the plaintiff was over 18 years, six months old, which indicates that the plaintiff wished to learn to drive and had obtained a learner's permit but was having difficulty. It was advised that she obtain 40 hours of training. (Tr. 76-9).

The plaintiff testified at the February 11, 2003 hearing before ALJ Schultz that she had not obtained her license. (Tr. 400).

Additionally, the plaintiff testified that she had obtained a summer job assisting her grandmother in the kitchen at the Pioneer Playhouse but was unable to complete a job application by herself and had trouble with math. (Tr. 396). She

was able to perform some activities such as simple cooking and household chores, but did not think she would be able to make it through a job without help. (Tr. 398, 402). She could engage in some activities such as watching TV, shopping at a mall with friends, and listening to music on the internet. (Tr. 408-9).

In his 2003 decision, ALJ Schultz relied primarily on a consultative psychological evaluation by Dr. Stuart Cooke, which had been conducted on January 3, 2001. (Tr. 296). This was approximately ten months before the plaintiff's current application for SSI, and several weeks before her eighteenth birthday. Of the voluminous school records summarized above, Dr. Cooke reviewed only a psycho-educational report from the sixth grade. (Id.). The plaintiff's grandmother also provided a March, 2000 report indicating that the plaintiff was in Special Education and had "mild mental," but no testing scores were provided. (Tr. 297). Dr. Cooke observed that the plaintiff was cooperative and knew the names of two past presidents, but did not know the number of weeks in a year and could not subtract 17 cents from a dollar. (Tr. 298). Dr. Cooke noted that the plaintiff could take care of her personal needs, do household chores, read a newspaper, and shop, although she did not shop alone. (Tr. 299). On the Wechsler Adult Intelligence Scale--Third Edition (WAIS-III) she obtained a verbal IQ of 70, a performance of 70, and a full scale IQ of 67. (Tr. 300). Dr. Cooke commented that he did not believe that the plaintiff qualified for a diagnosis of mild mental

13

08-159 Kandiace Singleton

retardation based on the fact that the verbal and performance scores were both in the "borderline" range and "this score is inconsistent with her level of adaptive functioning." He diagnosed borderline intellectual functioning. He also noted that the plaintiff could read at the high school level which "may indicate that her IQ scores may be a low estimate of her true level of intellectual functioning." (Tr. 300-1).

Although ALJ Schultz found that the plaintiff's scores put her in the range of BIF rather than mild mental retardation, the Diagnostic and Statistical Manual of Mental Disorders (4th Ed.--Text Revision) (DSM-IV-TR) defines mild mental retardation as representing an IQ level of "50-55 to approximately 70." Id. at 42. It also notes that there is a measurement error of approximately five points when assessing IQ and it was possible to diagnose mental retardation in individuals of IQs between 70 and 75 who exhibit significant deficits in adaptive behavior, but mental retardation would not be diagnosed in an individual with an IQ lower than 70 if there were no significant deficits or impairments in adaptive functioning. Id. at 41-2.

No further IQ testing was conducted until February, 2007, when the plaintiff was evaluated by Dr. Dennis Sprague. (Tr. 488). Dr. Sprague apparently had no prior records to review other than the evaluation by Dr. Cooke, and he cited only the previous examiner's ultimate conclusion that the plaintiff fell within the range of BIF. (Tr. 489). In the absence of any school records, Dr. Sprague described that plaintiff

as stating that she got As and Bs throughout school and "was involved in all the classes." (Tr. 490). Her thinking was concrete, and she had a below-average knowledge of current events, social insight, and judgment. (Id.). Intelligence testing showed a verbal IQ of 81, a performance IQ of 72, and a full scale IQ of 75, while achievement tests showed high school reading and spelling but only second grade math skills. (Tr. 491-2). Dr. Sprague concluded that although the plaintiff was presently functioning within the borderline range of intellectual functioning, there appeared to be evidence to support a hypothesis of intellectual limitation as well as a learning disability. (Tr. 492). His diagnostic impressions were of a mathematics disorder, a learning disorder, and borderline intellectual functioning. (Tr. 493). Dr. Sprague listed the specific restrictions adopted by ALJ Paris in his hypothetical question to the VE. Sprague also commented that the plaintiff would need assistance managing her own funds due to her second grade arithmetic ability.

On appeal, the plaintiff objects to ALJ Paris's evaluation of the evidence, particularly the evidence contained in the school records. She notes that he began by incorporating the findings and conclusions from the previous decision by ALJ Schultz (Tr. 434), and repeated certain questionable aspects of the previous decision, including selective citations from the school records. For instance, both ALJs cited Christel Belcher as indicating that the plaintiff might be employable, but said nothing about the same teacher's comment that she had difficulty

15

08-159 Kandiace Singleton

understanding concepts beyond the concrete level, had a slow work rate, and frequently became frustrated with hard tasks. (Tr. 200). Neither ALJ cited her career adviser's belief that she would probably never be able to live by herself. (Tr. 196).

The level of adaptive functioning is one of the factors that must be considered in evaluating the plaintiff's claim that she meets the Commissioner's Listing of Impairment 12.05, which defines mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1. Listing 12.05 provides, <u>inter alia</u>, that the required level of severity is met by a showing of a valid verbal, performance, or full scale IQ of 59 or less, or scores of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. The Sixth Circuit has held that the evidence must support or demonstrate deficits in adaptive functioning before age 22. <u>Foster v. Halter</u>, 279 F.3d 348, 355 (6th Cir. 2001).

In contrast to the more typical 12.05C case, the transcript is replete with evidence of deficits in adaptive functioning before age 22. ALJ Paris appears to concede as much. (Tr. 439). The questions presented are the validity of the adult

IQ score, and the plaintiff's current level of adaptive functioning. These two issues are intertwined.

As the plaintiff notes, Dr. Cooke recorded scores in 2001, at the age of 18, consistent with LOI 12.05C. His conclusion that the plaintiff was functioning in the borderline range was partially based on the erroneous assertion, contradicted by the DSM-IV-TR, that her verbal and performance scores of 70 were in the borderline range, as well as the plaintiff's account of her current activities. (Tr. 301). Dr. Sprague's scores were higher and outside the range of the listing, but, like Dr. Cooke, he apparently did not review the extensive school records.

20 C.F.R. Pt. 404, Subpt. P, App. 1 12.00(D)(2) notes that an individual's level of functioning at a specific time varies, and emphasizes that "it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication to establish [a claimant's] impairment severity." In the present case, it appears that the evidence was obtained, but was given little consideration, in that almost none of it was provided to the consultative examiners, and both of the ALJs quoted only those portions of the evidence that bolstered their conclusions. Gathering longitudinal evidence does not by itself satisfy the regulations if it is not ever evaluated.

Subsection 12.00(D)(6) provides that "the narrative report that accompanies the [IQ] test results should comment on whether the IQ scores are considered valid

and consistent with the developmental history and the degree of functional limitation." Dr. Sprague's relatively high IQ test results were not correlated with the developmental history, and IQs, because he was not provided with them. The ALJ disposed of the issue by stating that he was aware of the plaintiff's "early childhood" test scores showing mild mental retardation, but "current testing and the claimant's activities of daily living demonstrate that she actually functions at [the BIF level]." (Tr. 439). The plaintiff, as previously noted, recorded IQ scores in the MMR range at the age of 18, and even lower scores at the age of 16, neither of which were "early childhood."[2] There is no analysis of why the plaintiff's scores should have improved, or why her level of functioning may have increased.

In sum, this is a case in which the use of a medical advisor with access to all of the evidence would have been useful. As it stands, the administrative decision is not supported by substantial evidence.[3]

---

[2] In addition, Dr. Sprague's performance IQ score of 72 is only 2 points higher than the 70 obtained by Dr. Cooke, within the 5 point margin of error. DSM-IV-TR, p. 41. These low scores appear to correlate with the performance difficulties noted on the job and in classrooms by the high school vocational sources and teachers.

[3] One court has suggested that if an IQ test appears incongruous with the abilities the claimant has demonstrated in the past, an inquiry should be made into: (1) the claimant's intellectual skills, such as the ability to understand and remember instructions; (2) whether the claimant's intellectual skills were necessary in any of the jobs the claimant performed in the past; and (3) whether the claimant's current mental abilities are markedly different from his or her past abilities. Cole v. Bowen, 1988 WL 6904 (N.D. Ill. 1988), quoted in 3 Social Security Law and Practice § 39.42 (Michael Flaherty et al. eds. 2006).

08-159  Kandiace Singleton

There is an additional issue in that counsel for the plaintiff submitted interrogatories to the ALJ in order to question Dr. Sprague about his test results. (Tr. 485-7).  The ALJ noted the receipt of the interrogatories (Tr. 485), but apparently did not forward them to Dr. Sprague.  The Sixth Circuit has noted that withholding interrogatories requested by a claimant can rise to the level of a due process violation.  <u>Flatford v. Chater</u>, 93 F.3d 1296, 1306-7 (6th Cir. 1996).  In the present case, however, counsel for the plaintiff did not raise the issue of interrogatories at a subsequent administrative hearing when she was asked if she had any objection to Dr. Sprague's report being introduced into the record, which might represent a waiver of her request.  (Tr. 584).  In any event, the issues in the interrogatories can be addressed on remand.

The decision will be remanded for further consideration.

This the 30th day of December, 2008.

**Signed By:**

<u>G. Wix Unthank</u>

**United States Senior Judge**